USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 11/25/13

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-----------------------------------------------------X

UNITED STATES OF AMERICA

     - against -

IFEANYICHUKWU ERIC ABAKPORO
and LATANYA PIERCE,

          **Defendants.**
-----------------------------------------------------X

**OPINION AND ORDER**

**S3 12 CR 340 (SAS)**

**SHIRA A. SCHEINDLIN, U.S.D.J.:**

     Following a three-week jury trial, Ifeanyichukwu Eric Abakporo ("Abakporo") and Latanya Pierce (collectively, the "defendants") were found guilty on all three counts of the S3 Superseding Indictment (the "Indictment"). In their post-trial motions, both defendants seek a judgment of acquittal under Federal Rule of Criminal Procedure 29 ("Rule 29") while Abakporo renews his pre-trial motion for severance from co-defendant Pierce. In addition, proceeding in a pro capacity, Abakporo moves for dismissal of the Indictment in its entirety.[1] For the following reasons, all motions are DENIED.

---

[1]      Although Abakporo is represented by counsel and would therefore be foreclosed from bringing a motion on his own behalf, his attorney has argued that Abakporo, who is also an attorney, is acting as co-counsel in submitting the pro se Motion to Dismiss Counts I, II, and III of the Superseding Indictment of Defendant Ifeanyichukwu Eric Abakporo ("Motion to Dismiss"). I will accept defense counsel's creative argument in the interest of justice and rule on the merits of this motion.

## I.    BACKGROUND

### A.    The Indictment

The Indictment charges Abakporo and Pierce with one count of conspiring to commit bank fraud in violation of Title 18, United States Code, Section 1349 (Count One), one count of conspiring to commit wire fraud in violation of Title 18, United States Code, Section 1349 (Count Two), and one count of bank fraud in violation of Title 18, United States Code, Section 1344 (Count Three).  Counts One and Two charge fraudulent conspiracies in connection with various residential and commercial real estate transactions and mortgage loan applications.  Count Three charges a substantive bank fraud offense in connection with a $1.8 million mortgage loan obtained by Creekhill Realty, LLC (Pierce's real estate company) from Washington Mutual Bank, secured by an apartment building located at 1070 St. Nicholas Avenue, New York, New York.

### B.    Abakporo's Pre-Trial Severance Motion

At a status conference on June 12, 2013, Pierce's attorney, Michael Cornacchia, stated that he intended to raise a defense for Pierce that would be antagonistic toward Abakporo.  Cornacchia stated that his team would act as a "second set of prosecutors" in defending Pierce.  Pierce's proposed defense was that she was simply following the advice of Abakporo, who was her attorney,

mentor and pastor; therefore she lacked criminal intent with respect to any fraud. Abakporo's defense was that: he did not possess the requisite intent to commit the charged crimes; he did not commit any illegal acts; and the so-called victims of the charged acts were, in fact, not victimized.

On June 19, 2013, Abakporo moved to sever his trial from that of Pierce pursuant to Federal Rule of Criminal Procedure ("Rule 14"). Abakporo argued that Pierce would present an "antagonistic defense," namely, that Pierce acted on Abakporo's advice and instructions and thus that she lacked the requisite mens rea with respect to the charged offenses.[2] According to Abakporo, the jury would either have to believe Pierce's testimony that Abakporo broke the law and advised Pierce to do the same or Abakporo's testimony that he did not break the law.[3] In sum, Abakporo argued that there could "be no question of the prejudice that Abakporo will suffer if Pierce tells the jury, in sum and substance, that she did not believe she was breaking the law, but if she did, it was because Abakporo told

---

[2] *See* Memorandum of Law in Support of Defendant Ifeanyichukwu Eric Abakporo's Motion for Severance at 2, dated June 19, 2013 ("Even if Ms. Pierce does not go as far as to assert that Mr. Abakporo is guilty of the crimes charged, the clear implication will be that she merely followed his advice so any culpability for wrongdoing falls on Mr. Abakporo. Such an implication severely prejudices Mr. Abakporo and would tend to preclude his acquittal.").

[3] *See id.* at 3.

her to do it."[4]

On July 2, 2013, I denied the severance motion, finding that the proposed defenses were consistent. I acknowledged, however, that severance would be appropriate were the defenses antagonistic and that there was a fine line distinguishing between consistent and antagonistic defenses. Cornacchia assured the Court and Abakporo's counsel that he would not pursue a defense beyond stating that Pierce acted at Abakporo's direction and would not accuse Abakporo of committing the charged crimes.

## II.   LEGAL STANDARDS

### A.   Rule 29

The legal standards applicable to motions for judgments of acquittal pursuant to Rule 29 are well-established. "A defendant challenging the sufficiency of the evidence supporting a conviction faces a 'heavy burden.'"[5] In evaluating a Rule 29 insufficiency claim, the trial evidence must be viewed in the light most favorable to the Government.[6] "Viewing the evidence in the light most favorable

---

[4]      *Id.* at 4 (titles deleted).

[5]      *United States v. Glenn*, 312 F.3d 58, 63 (2d Cir. 2002) (quoting *United States v. Matthews*, 20 F.3d 538, 548 (2d Cir. 1994)).

[6]      *See United States v. Persico*, 645 F.3d 85, 104 (2d Cir. 2011). *Accord Jackson v. Virginia*, 443 U.S. 307, 319 (1979) ("[T]he relevant question is whether, after viewing the evidence in the light most favorable to the prosecution,

to the government means crediting every inference that the jury might have drawn

in favor of the government, and recognizing that the government's evidence need

not exclude every other possible hypothesis[.]"[7]   Indeed, a court must "resolve all

issues of credibility in favor of the jury's verdict."[8]   "In a close case, where 'either

of the two results, a reasonable doubt or no reasonable doubt, is fairly possible, the

court must let the jury decide the matter.'"[9]

   Accordingly, in assessing the evidence, a court ultimately asks

whether "'*any* rational trier of fact could have found the essential elements of the

crime beyond a reasonable doubt.'"[10]   Under this "any rational trier of fact"

standard, "[a] judgment of acquittal can be entered 'only if the evidence that the

---

*any* rational trier of fact could have found the essential elements of the crime
beyond a reasonable doubt.") (emphasis in original).

  [7]  *Persico*, 645 F.3d at 104  (quotation marks and citations omitted).

  [8]  *United States v. Desena*, 287 F.3d 170, 177 (2d Cir. 2002) (quotation
marks and citation omitted).  *Accord United States v. Abelis*, 146 F.3d 73, 80 (2d
Cir. 1998).

  [9]  *United States v. Cuti*, 720 F.3d 453, 461 (2d Cir. 2013) (quoting
*United States v. Temple*, 447 F.3d 130, 137 (2d Cir. 2006) (quotation marks and
alteration omitted)).

  [10]  *United States v. Vilar*, 729 F.3d 62, 91 (2d Cir. 2013) (quoting
*Jackson*, 443 U.S. at 319, emphasis in original).  *Accord Desena*, 287 F.3d at 176
("To succeed on his claims of insufficient evidence [defendant] must show that no
rational trier of fact, viewing the evidence in the light most favorable to the
government, could have found him guilty beyond a reasonable doubt of the
essential elements of the crimes charged.").

defendant committed the crime alleged is nonexistent or so meager that no reasonable jury could find guilt beyond a reasonable doubt.'" [11]

"A conspiracy conviction cannot be sustained unless the government established beyond a reasonable doubt that the defendant had the *specific intent* to violate the substantive statute."[12]  The Government must "present some evidence from which it can reasonably be inferred that the person charged with [a] conspiracy knew of the existence of the scheme alleged in the indictment and knowingly joined and participated in it."[13]  "The traditional deference accorded to a jury's verdict "is especially important when reviewing a conviction for conspiracy . . . because a conspiracy by its very nature is a secretive operation, and it is a rare case where all aspects of a conspiracy can be laid bare in court with the precision of a surgeon's scalpel.'"[14]

---

[11]     *Cuti*, 720 F.3d at 461 (quoting *United States v. Espaillet*, 380 F.3d 713, 718 (2d Cir. 2004)).

[12]     *United States v. Hassan*, 578 F.3d 108, 123 (2d Cir. 2008) (emphasis in original).

[13]     *United States v. Rodriguez*, 392 F.3d 539, 545 (2d Cir. 2004) (quotation marks and citation omitted).

[14]     *United States v. Jackson*, 335 F.3d 170, 180 (2d Cir. 2003) (quoting *United States v. Pitre*, 960 F.2d 1112, 1121 (2d Cir. 1991) (internal quotation marks and citations omitted) (ellipsis in original)).  *Accord United States v. Snow*, 462 F.3d 55, 68 (2d Cir. 2006).

**B.     Severance**

Rule 14 provides that "if the joinder of offenses or defendants in an indictment, an information, or a consolidation for trial appears to prejudice a defendant or the Government, the court may order separate trials of counts, sever the defendants' trials, or provide any other relief that justice requires."[15] According to the Second Circuit,

> "Considerations of efficiency and consistency militate in favor of trying jointly defendants who were indicted together, [and] [j]oint trials are often particularly appropriate in circumstances where the defendants are charged with participating in the same criminal conspiracy. . . ." *United States v. Spinelli*, 352 F.3d 48, 55 (2d Cir. 2003) (citations omitted). "The decision to sever a joint trial of federal defendants is committed to the sound discretion of the trial judge[, and is c]onsidered virtually unreviewable." *United States v. Diaz*, 176 F.3d 52, 102 (2d Cir. 1999) (internal quotation marks and citations omitted). "[T]o compel reversal, the defendant has the heavy burden to show prejudice so severe that his conviction constituted a miscarriage of justice." *United States v. Ferguson*, 676 F.3d 260, 286-87 (2d Cir. 2011) (internal quotation marks omitted).[16]

"In interpreting Rule 14, the Courts of Appeals frequently have expressed the view that 'mutually antagonistic' or 'irreconcilable' defenses may be

---

[15]     Fed. R. Crim. P. 14.

[16]     *United States v. James*, 712 F.3d 79, 104 (2d Cir. 2013) (alterations in original).

7

so prejudicial in some circumstances as to mandate severance."[17]  "'Mutually antagonistic defenses are not prejudicial per se,'"[18] but "'antagonistic defenses may conflict to such a degree that codefendants are denied a fair trial.'"[19]  However, "'the defenses must conflict to the point of being so irreconcilable as to be mutually exclusive before [courts] will find such prejudice as denies defendants a fair trial.'"[20]  In other words, "[d]efenses are mutually antagonistic when accepting one defense requires that 'the jury must of necessity convict a second defendant.'"[21]  This is what is known as "legally cognizable prejudice."[22]

  "A defendant seeking severance under Rule 14 therefore shoulders the 'extremely difficult burden' of showing that he would be so prejudiced by joinder

---

[17] *Zafiro v. United States*, 506 U.S. 534, 538 (1992) (citations omitted).

[18] *United States v. Basciano*, No. 05-CR-060, 2007 WL 3124622, at *8 (E.D.N.Y. Oct. 23, 2007) (quoting *Zafiro*, 506 U.S. at 538).

[19] *Id.* (quoting *United States v. Cardascia*, 951 F.2d 474, 484 (2d Cir. 1991)).

[20] *United States v. Bennett*, 485 F. Supp. 2d 508, 513 (S.D.N.Y. 2007) (quoting *Cardascia*, 951 F.2d at 484).

[21] *United States v. Yousef*, 327 F.3d 56, 151 (2d Cir. 2003) (quoting *Cardascia*, 951 F.2d at 484) .  *Accord United States v. Salameh*, 152 F.3d 88, 116 (2d Cir. 1998).

[22] *Zafiro*, 506 U.S. at 541.

that he would be denied a fair trial."[23]  It is not enough for a defendant to show that

he "may have a better chance of acquittal in [a] separate trial[]."[24]  Instead, "a

district court should grant a severance under Rule 14 only if there is a serious risk

that a joint trial would compromise a specific trial right of one of the defendants, or

prevent the jury from making a reliable judgment about guilt or innocence."[25]

In those rare instances where a defendant establishes a "high" risk of

prejudice, however, "less drastic measures, such as limiting instructions, often will

suffice to cure any risk of prejudice."[26]  Any spillover prejudice that may occur as a

result of trying two or more defendants jointly can be addressed by instructions to

the jury that it consider the guilt of each defendant individually.[27]

---

[23]    *United States. v. Johnson*, No. S2 10 CR 431, 2013 WL 150104, at \*2 (S.D.N.Y. Jan. 10, 2013) (quoting *United States v. Casamento*, 887 F.2d 1141, 1149 (2d Cir. 1989) (internal quotation marks omitted)).

[24]    *Zafiro*, 506 U.S. at 540.

[25]    *Id.* at 539.  *Accord United States v. Panza*, 750 F.2d 1141, 1149 (2d Cir. 1984) (explaining that prejudice must be "sufficiently severe to outweigh the judicial economy that would be realized by avoiding lengthy multiple trials").

[26]    *Zafiro*, 506 U.S. at 539 (citing *Richardson v. Marsh*, 481 U.S. 200, 211 (1987)).  *Accord United States v. Freyer*, 333 F.3d 110, 114 (2d Cir. 2003).

[27]    *See United States v. Johnson*, No. S2 10 CR 431, 2012 WL 2878154, at \*3 (S.D.N.Y. July 12, 2012) (citing *United States v. Potamitis*, 739 F.2d 784, 790 (2d Cir. 1984)).

## III.   DISCUSSION

### A.   Abokporo's Post-Trial Motions by Counsel

#### 1.   Abakporo's Renewed Motion to Sever

In renewing his motion for severance,[28] Abakporo argues that during Cornacchia's  opening statement, cross-examination and closing statement, he presented an antagonistic defense on behalf of Pierce by accusing Abakporo of committing the charged crimes and attacking his character.   For example, in his opening statement, Cornacchia stated as follows:

> And is she guilty?  Yes.  She is as guilty as sin, to use a phrase.   Guilty of trusting this man, of believing him, blindly, and in doing things which you'll say how could she do.
>
> But one of the things here is you are judging Latanya, individually.  And the judge will instruct you on the crimes she is accused of.  And that's important.  Because you have to understand the context.  Because you may say, well, that's ridiculous, why would someone do that?  But you are going to have to think and see the context Latanya was in.  My mentor my attorney, my pastor.  That's who this man was.  And she is guilty of placing her trust and belief in

---

[28]      The Government argues that the renewal of this motion is, in fact, a motion for a new trial governed by Federal Rule of Criminal Procedure 33 ("Rule 33").  It was never my intention, however, to impose the heavy burden associated with Rule 33 onto this severance motion.  *See United States v. Ferguson*, 246 F.3d 129, 134 (2d Cir. 2001) (stating that "there must be a real concern that an innocent person may have been convicted" for relief to be granted under Rule 33).  Rather, I view the renewal of this motion as more akin to a request for reconsideration in light of new evidence, namely, the evidence produced at trial.

him.  And it appears she was betrayed.

So when the prosecutor talks about betrayal, he is also talking about Latanya Pierce being betrayed.[29]

In making this opening, Cornacchia arguably "implied" that Abakporo was, in fact, guilty of the crimes charged and that Pierce's trust in him was misplaced.[30]  Abakporo further argues that when Cornacchia cross-examined him, he "suggested" that Abakporo directed Pierce to commit crimes by signing as the attorney-in-fact at various closings.[31]  "In addition, during his cross-examination of Abakporo, Cornacchia also *suggested* that Abakporo know Pierce was engaging in criminal activity in her discussions with McCarther and that he purposefully withdrew from participating in the negotiations on this basis."[32]

Abakporo also objects to Cornacchia's closing statement where he continued discussing Abakporo's criminal activity and Pierce's reliance on Abakporo.  During his summation, Cornacchia stated:

---

[29]    Memorandum of Law in Support of Defendant Ifeanyichukwu Eric Abakporo's Post-Trial Motions ("Post-Trial Mem.") at 2 (quoting Trial Transcript ("Tr.") at 46-47).

[30]    *Id.*

[31]    *Id.* at 3 (quoting Tr. at 1931-1933).

[32]    *Id.* at 4 (quoting Tr. at 1942-1945).

11

> Why do people trust people.  And you say to yourself, I
> wouldn't walk into a closing, just sign on someone's word
> there was a power of attorney.  But if the person asking you
> is your mentor, your pastor, and your attorney, then that's
> a different story.  And that's what the evidence shows.
> Advice of counsel.  And that's why Latanya did it.

From this closing, Abakporo concludes that Pierce's defense was that Abakporo

engaged in criminal conduct and advised her to do the same.[33]

With regard to Cornacchia's opening and closing statements, the jury

was properly instructed that such statements are not evidence.  The jury was also

instructed to "consider each count and each defendant separately and return a

separate verdict of guilty or not guilty for each of the defendants on each count."[34]

Before opening statements were made, I told the jury: "The statements and

arguments of the attorneys, such as the opening arguments we're about to hear,

that's not evidence."[35]  Before the jury began deliberating, they were again told:

> This case is not to be decided on the rhetoric of the
> attorneys.  What the lawyers have said in their opening
> arguments, in their summations, in their objections, or in
> their questions is not evidence.  What I say is not evidence.
> Only the answer of a witness is evidence and documents

---

[33]     *See* Post-Trial Mem. at 6.

[34]     Tr. at 2126.

[35]     *Id.* at 17.

12

and other tangible things received in evidence.[36]

As noted, Cornacchia's remarks to the jury were not evidence. Moreover, these remarks were not truly antagonistic to Abakporo's defense. In those statements, Cornacchia argued that Pierce was simply following the advice of Abakporo – who was her attorney, pastor and mentor – and therefore lacked criminal intent as to any fraud. Cornacchia did not argue that the evidence proved that Abakporo committed a crime, nor did he argue that Pierce's innocence necessarily meant that Abakporo was guilty. Instead, Cornacchia merely argued that Pierce had acted on Abakporo's advice. Thus, Pierce's advice of counsel defense, described in her attorney's opening and closing statements, did not present the type of truly antagonistic defense that would warrant severance.

Nor was Cornacchia's cross-examination of Abakporo necessarily antagonistic to Abakporo's defense strategy. The questioning about Pierce signing as attorney-in-fact at various closings was not antagonistic as Abakporo was not asked whether Pierce's signing as attorney-in-fact was in furtherance of a criminal scheme. The questioning was merely intended to establish whose advice Pierce relied upon in signing as attorney-in-fact and that she acted on the advice of counsel in doing so. The line of questioning about "jumping off the train" is a

---

[36]    *Id.* at 2111.

closer call, as the following colloquy demonstrates:

> Q.    I mean, correct me if I'm wrong, you said something about the lawyers backed away because we have to think about our licenses or something?
>
> A.    That's what I just told you what the licenses meant.
>
> Q.    So you knew this, this process was going along, but you and Gibbs kind of jumped off the train, so to speak; do you know what I mean?
>
> A.    We jumped of[f] the train because, again, I don't know – I won't ask you that question.  But in the practice a time comes –
>
> Q.    You understand what I just said?
>
> A.    I understand what you said, but it's not the way you said it. We did not jump off a train.
>
> Q.    Let me rephrase it so you do.  You know there's discussions about how to [sic] it sounds like conceal money maybe and everybody in the room knew about it, including the lawyers. But you guys, you and Gibbs, the lawyers, kind of go, whoops, we're getting out of the room.
>
> A.    Yes, and let me bring it to you –
>
> Q.    Is that a yes, you're agreeing with me?
>
> A.    Let me give it to you in the raw form . . . .[37]

While this type of finger-pointing may "support a finding of potentially

inconsistent defenses, it does not support a finding of antagonistic defenses."[38]  In

---

[37]    *Id.* at 1942.

[38]    *United States v. Schlegel*, No. 06-CR-0550, 2009 WL 3837305, at *4 (E.D.N.Y. Nov. 16, 2009).

*United States v. Schlegel*, the defendant (Brooks) argued that his co-defendant

(Hatfield) "is likely to blame Brooks as part of her defense, whereas Brooks will

deny knowledge of the fraudulent activity."[39]   In denying Brooks' motion to sever,

the court stated as follows:

> In any event, Brooks has not shown that he and Hatfield
> have antagonistic defenses mandating severance.   While
> severance is justified where "the jury, in order to believe
> one defendant, must necessarily disbelieve the testimony
> offered on behalf of his codefendant," here, Brooks has not
> shown that such a conflict exists.   *United States v.
> Casamento*, 887 F.2d 1141, 1153 (2d Cir. 1989) (internal
> quotations and citations omitted).   Brooks merely argues
> that Hatfield may blame him for the alleged fraudulent
> activity.   However, "[t]he mere fact that co-defendants seek
> to place the blame on each other is not the sort of
> antagonism that requires a severance."   *Persaud v. United
> States*, No. 04–CV–2861, 2005 U.S. Dist. LEXIS 45527, at
> *9 (E.D.N.Y. Dec. 28, 2005); *see also United States v.
> Casamento*, 887 F.2d 1141, 1154 (2d Cir. 1989) (finding
> that "[m]ere fingerpointing does not require severance.")
> (internal quotation marks omitted); *United States v. Yousef*,
> 1997 U.S. Dist. LEXIS 10449, at *5-6 (S.D.N.Y. July 16,
> 1997) (Defendant's argument that co-defendant "might
> attempt to blame him for the alleged crimes" was
> speculative and did "not rise to the level of "mutually
> antagonistic" defenses.   Even if [the defendant's]
> speculation prove[ed] true, the fact that one defendant seeks
> to place blame on the other is not a sufficient basis for
> severance.").   While Brooks' argument may support a
> finding of potentially inconsistent defenses, it does not
> support a finding of antagonistic defenses.

---

[39]     *Id.* at *3.

Furthermore, even if the Court were to find the defenses antagonistic, such a finding, alone, does not warrant severance. Brooks would have to show that the defenses are so prejudicial to him as to mandate severance. Brooks has not made such a showing.[40]

In addition, there is another reason why Abakporo was not prejudiced by Pierce's advice-of-counsel defense – namely the overwhelming evidence of Abakporo's guilt. The jury heard testimony from: individuals whose signatures were forged and/or whose identities were stolen by Abakporo for use in fraudulent real estate transactions and mortgage loan applications; the title company who received forged and altered documents from Abakporo; the banks who received falsified information and forged signatures from Abakporo and his co-conspirators; the straw borrowers who met with Abakporo in connection with fraudulent mortgage loan applications; the provider of a one million dollar single-day loan that Abakporo and Pierce used as "show money" to close on the apartment building at 1070 St. Nicholas Avenue; and two cooperating witnesses who committed mortgage fraud along with Abakporo. The jury saw numerous forged and fraudulent documents that were created in the course of the fraudulent scheme, including: false verifications of rent purportedly signed by one of Abakporo's in-laws on behalf of his real estate company; documents bearing the forged

---

[40] *Id.* at *4.

signatures of Abakporo's purported clients who were deceased at the time the

documents were signed; documents where Abakporo falsely notarized the

signatures of individuals who did not actually sign the documents; and documents

where Abakporo notarized his own forgery of signatures.  The jury saw financial

records documenting: payments made by Abakporo on some of the fraudulently

obtained mortgages out of his own accounts and in the names of straw buyers; and

the distribution of ill-gotten funds from the fraudulently obtained mortgages,

including hundreds of thousands of dollars that went directly to Abakporo.  In light

of this overwhelming amount of inculpatory evidence, Abakporo cannot show that

he was prejudiced by Pierce's defense at all, much less the level of prejudice that

would warrant severance.  Abakporo's renewed motion to sever is therefore

denied.

### 2.   Abakporo's Motion for Acquittal

In his motion for acquittal pursuant to Rule 29, Abakporo argues that

as to each count, "the evidence presented at trial was insufficient, as a matter of

law, to form the basis of a guilty verdict and that the verdict was, therefore, against

the weight of the evidence."[41]  Abakporo does not specifically state in what way

---

[41]     Post-Trial Mem. at 7.  Abakporo also argues that the evidence was
insufficient to prove that certain lenders were "financial institutions" under the
bank fraud statute and that the question of whether the banks were "financial
institutions" should have been decided by the Court as a matter of law, rather than

the evidence at trial was insufficient to prove his guilt beyond a reasonable doubt. He merely moves in conclusory fashion without further elaboration. This is an insufficient basis in which to move for judgment of acquittal. Moreover, as demonstrated above, there was ample evidence against Abakporo. Accordingly, Abakporo's motion for judgment of acquittal under Rule 29 is denied.

### B.   Abakporo's Pro Se Motion

In his pro se Motion to Dismiss, Abakporo argues that: the element of whether a "financial institution" was involved in the bank fraud offenses should have been decided by the Court as a matter of law, not by the jury as a matter of fact;[42] the jury was improperly charged;[43] none of the mortgage loan issuers were FDIC-insured "financial institutions;"[44] and the Government engaged in prosecutorial misconduct by purportedly threatening potential defense witnesses and defendant's family and friends.

---

by the jury as a matter of fact. These issues were raised more fully in Abakporo's pro se motion and will be addressed *infra* at Part III(B)(1).

[42]    *See* Motion to Dismiss at 3.

[43]    *See id.* at 4.

[44]    *See id.* at 5-8.

1.      **Financial Institution Element**

a.      **Submission to the Jury**

Because the involvement of a "financial institution" is an element of

the offense of bank fraud,[45] this element was properly submitted to the jury for its

determination.[46]  As stated by the Supreme Court:

> The Fifth Amendment to the United States Constitution
> guarantees that no one will be deprived of liberty without
> "due process of law"; and the Sixth, that "[i]n all criminal
> prosecutions, the accused shall enjoy the right to a speedy
> and public trial, by an impartial jury."  We have held that
> these provisions require criminal convictions to rest upon
> a jury determination that the defendant is guilty of every
> element of the crime with which he is charged, beyond a
> reasonable doubt.[47]

Abakporo points to a telephone conference held on June 12, 2013, in which I

characterized the determination of whether an entity is a "financial institution" as a

---

[45]      *See United States v. Norris*, 513 Fed. App'x 57, 59 (2d Cir. 2013)
("'The well established elements of the crime of bank fraud are that the defendant
(1) engaged in a course of conduct designed to deceive a federally chartered or
insured financial institution into releasing property; and (2) possessed an intent to
victimize the institution by exposing it to actual or potential loss.'") (quoting
*United States v. Barrett*, 178 F.3d 643, 647-48 (2d Cir. 1999)).

[46]      *See United States v. Ghavami*, No. 10 CR 1217, 2012 WL 2878126, at
*7 (S.D.N.Y. July 13, 2012) ("Whether an offense affected a financial institution is
a question of fact for a jury to decide.") .

[47]      *United States v. Gaudin*, 515 U.S. 506, 509-10 (1995) (citing *Sullivan
v. Louisiana*, 508 U.S. 275, 277-78 (1993) (alteration in original)).

purely legal question.[48]   However, after receiving letter-briefs from the parties, I

revised my initial conclusion and ruled that "financial institution" status is a

question of fact to be decided by the jury.[49]   Because my revised ruling is in

accordance with existing case law, the first ground of Abakporo's Motion to

Dismiss is denied.

### b.   Jury Charge

Abakporo argues that the jury charge did not specify that, under 18

U.S.C. § 1344, a "financial institution" must be federally chartered or FDIC

insured.  However, the jury was properly charged as to the financial institution

element when I recited the elements for Counts One and Three.  With respect to

Count One, the jury was charged as follows:

> It was a part and an object of the conspiracy that Abakporo
> and Pierce, the defendants, together with others known and
> unknown, willfully and knowingly, would and did, execute
> and attempt to execute a scheme and artifice to defraud
> financial institutions, *the deposits of which were then
> insured by the Federal Deposit Insurance Corporation*, and
> to obtain the moneys, funds, credits, assets, securities, and
> other property owned by, and under the custody and control
> of, such financial institutions by means of false and
> fraudulent pretenses, representations, and promises in

---

[48]   *See* 6/12/13 Telephone Conference Transcript at 5 ("I think this is a
pure matter of law that the court should decide.").

[49]   *See* 6/20/13 Telephone Conference Transcript at 3 ("I can't decide this
as a matter of law.  It has to go to a jury . . . . ").

violation of Title 18 United States Code Section 1344.[50]

With respect to Count Three, substantive bank fraud, the following charge was given:

> In order to prove the defendant you are considering guilty of bank fraud, the government must establish beyond a reasonable doubt the following three essential elements: first, that on or about the date set forth in the indictment, the defendant you are considering executed, attempted to execute, or participated in a scheme or artifice to defraud a bank. That is a scheme or artifice to obtain money owned by, or under the custody or control of the bank by means of false or fraudulent pretenses, representations, or promises; second, that the defendant you are considering knowingly and willfully engaged in the scheme or artifice. That is, that he or she acted with knowledge of the fraudulent nature of the scheme and with the specific intent to defraud the bank, or to obtain by deceiving the bank, money owned or controlled by that bank; *and third, that the bank involved was federally insured by the FDIC.*[51]

I further elaborated on the "financial institution" element as follows:

> The final element the government must prove beyond a reasonable doubt under counts one and three of the indictment is that the bank in question was a federally-insured financial institution at the time of the scheme. This simply means that the bank's deposits had to be insured by the FDIC during the time frame alleged in the indictment.[52]

---

[50]   Tr. at 2127 (emphasis added).

[51]   *Id.* at 2140 (emphasis added).

[52]   *Id.* at 2146.

Furthermore, two lenders were listed on the Verdict Sheet –
Washington Mutual Bank and Freemont Investment & Loan.[53]  The Verdict Sheet
asked: "do you find at least one of the lenders you selected above were financial
institutions whose deposits were insured by the FDIC, or were wholly owned by
financial institutions whose deposits were insured by the FDIC, yes or no."[54]
Accordingly, the jury was properly charged as to the financial-institution element.
Abakporo's contention that the financial-institution element was improperly
submitted to the jury is without merit and is rejected.

### c.      Sufficiency of the Evidence

Contrary to Abakporo's argument, there was sufficient evidence
introduced at trial to support the jury's determination that Counts One and Three
involved financial institutions, namely, that Washington Mutual Bank and Fremont
Investment & Loan ("Fremont") were financial institutions fraudulently induced to
issue loans as part of the bank fraud offenses.

*First*, FDIC certificates of deposit insurance were introduced showing
that these institutions were depository institutions whose deposits were insured at
the relevant time frames.  *Second*, Rodney Watson, an FDIC bank examiner,

---

[53]      *See id.* at 2167.

[54]      *Id.* at 2168.

testified that these certificates showed that Washington Mutual Bank and Fremont were FDIC-insured during the relevant time frames.[55]

Abakporo's argument with respect to Washington Mutual Bank is that the FDIC certificate of insurance shows "Washington Mutual Bank" as the insured institution at the time it issued a commercial mortgage loan secured by property located at 1070 St. Nicholas Avenue, New York, New York, while the mortgage documents show "Washington Mutual Bank, F.A." as the lender.   Abakporo argues that Washington Mutual Bank, F.A. "surrendered it's [sic] federal charter and transferred it [sic] FDIC insurance certificate to its successor bank" and "ceased to exist as an FDIC insured bank" prior to the issuance of the commercial mortgage loan.[56]

There is no evidence in the record, however, that Washington Mutual Bank ever surrendered its charter or transferred its FDIC insurance certificate.  No documentary exhibits show this and no witness testified to it.  To the contrary, the FDIC's records indicate that on April 1, 2005, Washington Mutual Bank merely changed its name from "Washington Mutual Bank F.A." to "Washington Mutual Bank."  There is no evidence that Washington Mutual Bank ceased to exist, ceased

---

[55]     *See id.* at 1355-1359.

[56]     Motion to Dismiss at 3.

operations, or lost its FDIC-insured status.  Indeed, when Washington Mutual

Bank later underwent an actual change in its corporate status, the FDIC records

reflect this change.  JPMorgan Chase Bank's acquisition of Washington Mutual

Bank is reflected in the FDIC records as a purchase of assets and assumption of

liabilities. The change from Washington Mutual Bank F.A. to Washington Mutual

Bank was merely a change in name.  Moreover, Abakporo had an opportunity to

cross-examine both an FDIC bank examiner and an underwriter for Washington

Mutual Bank, yet elicited no testimony that Washington Mutual Bank was not

FDIC-insured at the time it issued the loan on 1070 St. Nicholas Avenue.

        Abakporo further argues that Fremont is a California company "not

registered nor licensed to operate the business of banking in the state of New

York."[57]  Abakporo cites no evidence in support of this contention, or in support of

his conclusion that Fremont was not FDIC-insured with respect to its lending

operations in New York.  The jury was entitled to rely on the following evidence in

concluding that Fremont was a financial institution : the FDIC certificate of

insurance showing that Fremont was FDIC-insured; testimony of an FDIC bank

examiner stating that Fremont was FDIC-insured; and testimony by a former

Fremont employee that Fremont was FDIC-insured. Thus, Abakporo's contention

---

[57]    *Id.* at 4.

that there was insufficient evidence to establish the financial-institution element is without merit.

### 2.      Prosecutorial Misconduct

Abakporo asserts that the Government: (1) threatened defendant's potential witnesses and family and friends; (2) lied to the grand jury, the judge, and the jury during summation; and (3) procured witnesses that lied for the Government.  Abakporo cites no evidence in support of these assertions. Prosecutorial misconduct may deny a defendant due process, where the misconduct is "'of sufficient significance to result in the denial of the defendant's rights to a fair trial.'"[58]  But there is no evidence of misconduct here, much less significant misconduct that resulted in the denial of a fair trial.  Abakporo's third ground to dismiss is therefore denied.

### C.      Pierce's Motion for Acquittal

### 1.      Mere Presence/Association

In her Rule 29 motion, Pierce argues that the evidence at trial amounts to no more than evidence of her: (1) "mere presence" at locations where fraudulent

---

[58]      *Blissett v. LeFevre*, 924 F.2d 434, 440 (2d Cir. 1991) (quoting *United States v. Bagley*, 473 U.S. 667, 676 (1985)).  *Accord United States v. Orena*, 32 F.3d 704, 717 (2d Cir. 1994) (prosecutorial misconduct must be sufficiently severe to deny defendant a fair trial in order to warrant reversal); *United States v. Parker*, 903 F.2d 91, 98 (2d Cir. 1990) (courts reluctant to reverse when misconduct is isolated).

transactions  were executed; and (2) "mere association" with the co-conspirators operating that scheme.[59]  Pierce's argument, however, mischaracterizes the evidence and improperly asks that credibility determinations and reasonable inferences be made and drawn in her favor rather than in favor of the jury's verdict.

Arguably, the only direct testimonial evidence of Pierce's involvement in the fraudulent scheme came from Verbelle Williams, a former attorney who had been arrested for bank fraud and became a cooperating witness. At the outset of her testimony, Williams identified Pierce as someone with whom she "committed mortgage fraud."[60]  Williams then provided the following testimony on direct examination:

> Q. What role did Ms. Pierce play in these deals?
>
> A. Well, as far as I know, they were partners in the transactions.
>
> Q. And how do you know that?
>
> A. Through discussions with both parties, discussions in which they said that they owned the properties.
>
> Q. So was she ever present at any closings?

---

[59]    Memorandum of Law in Support of Defendant Latanya Pierce's Post-Trial Motion Seeking a Judgment of Acquittal, Pursuant to Rule 29 of the Federal Rules of Criminal Procedure ("Pierce Mem.") at 7.

[60]    Tr. at 269.

A.    She was always present at the closings.

Q.    Specifically what did you witness her doing at some of these closings, generally, but what did you –

A.    Generally if we needed documents to clear the title, we could either ask her or Mr. Abakporo.  Most of the time she would have the documents. If, you know, whatever we needed to facilitate the closing. And if for any reason there were few instances where the parties did not show up and then she would sign the documents on behalf of that party.[61]

When asked how many properties she was involved in with Pierce where some

fraudulent conduct occurred, Williams answered "most of them."[62]

Instead of showing a mere association with Abakporo, the trial

evidence shows a long-standing business relationship with him.  The evidence also

shows her repeated engagement with Abakporo in fraudulent real estate and

mortgage loan transactions.  Moreover, Pierce's presence at countless fraudulent

closings was not coincidental; rather, she was an active participant in those

closings, signing documents as attorney-in-fact and forging signatures when

required to complete the transactions.[63]  Accordingly, this prong of Pierce's Rule

---

[61]    *Id.* at 272-273.

[62]    *Id.* at 279-280.

[63]    *See Snow*, 462 F.3d at 68 ("[W]here the government presents evidence tending to show 'that the defendant was present at a crime scene under circumstances that logically support an inference of association with the criminal

29 motion is denied.

### 2.    Advice of Counsel

The trial evidence revealed that the mortgage loan application submitted for 1070 St. Nicholas Avenue by Creekhill to Washington Mutual Bank contained false and misleading information.  Specifically, the loan application failed to disclose a private mortgage between Ina McArthur (the lender) and Creekhill (the borrower) in the amount of $1,988,000, on that property.[64]  Pierce now argues that "there was no evidence that Pierce knew that the relevant question on the application called for disclosure of a private, unrecorded mortgage."[65]  Yet an experienced mortgage broker testified that this is the type of information that absolutely should be disclosed in a mortgage application.[66]  Furthermore, the mortgage loan application, which represented that no other assets were pledged or debts secured, was false on its face.  A rational trier of fact could reasonably conclude that Pierce, a seasoned real estate veteran, knew of this falsehood and

---

venture,' a reasonable juror could conclude the defendant was a knowing and intentional criminal conspirator." (quoting *United States v. Eltayib*, 88 F.3d 157, 171 (2d Cir. 1996)).

[64]    *See* Tr. at 1159.

[65]    Pierce Mem. at 8.

[66]    *See* Tr. at 1161.

decided to conceal it.  Pierce's argument to the contrary is rejected.

Pierce also once again states that she reasonably relied on Abakporo's legal opinion that the $1.98 million private mortgage was not, in fact, a mortgage but a promissory note that Creekhill was not obligated to disclose to the lender (Washington Mutual Bank).  But Pierce presented this argument to the jury and the jury rejected it, after having been properly charged on the advice of counsel defense.[67]  The jury was entitled to do so based on the evidence introduced at trial. The jury's rational and well-supported decision will not be disturbed by this Court on a Rule 29 motion.  Pierce's Rule 29 motion is therefore denied in its entirety.

## IV.   CONCLUSION

For the foregoing reasons, the post-trial motions brought by defendants Abakporo and Pierce, through counsel and pro se, are denied.  The Clerk of the Court is directed to close these motions (Docket Entries # 150, 152, and 155).  The Clerk of the Court is further directed to close Abakporo's motion

---

[67]     The jury was instructed as follows: "When a person acts on and with the advice of counsel, that is, with the advice of an attorney, that is a defense to a charge of criminal wrongdoing, if certain criteria are met.  In this case, Pierce contends that she acted on the advice of an attorney.  In order for the advice of counsel to be a defense to one or more of the charges in this case, you must find that Pierce: (1) honestly and in good faith sought the advice of counsel; and (2) in good faith and honestly followed counsel's advice, believing it to be correct and intending that her acts be lawful."  *Id.* at 2125.

for an extension of time to file a reply, which has already been resolved (Docket

Entry # 168).


                                        SO ORDERED:


                                        _____
                                        Shira A. Scheindlin
                                        U.S.D.J.

Dated:       New York, New York
             November 25, 2013

**- Appearances -**

**For Defendant Abakporo:**

Lee A. Ginsberg, Esq.
Freeman, Nooter & Ginsberg
75 Maiden Lane, Suite 503
New York, NY 10038
(212) 608-0808

**For Defendant Pierce:**

Michael T. Cornacchia, Esq.
260 Madison Avenue, 22nd Floor
New York, NY 10016
(646) 839-2538

**For the Government:**

Michael D. Lockard
Ryan P. Poscablo
Assistant United States Attorneys
One St. Andrew's Plaza
New York, NY 10007
(212) 637-2193/2634